United States District Court
Southern District of Texas

**ENTERED**

September 30, 2023

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEREMY COLLINS COLLMORGEN, (TDCJ–CID #2219334), Petitioner, | § § § § § § | CIVIL ACTION NO. 4:22-cv-1971 |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| BOBBY LUMPKIN, Respondent. | § § § | |

MEMORANDUM ON DISMISSAL

The motion for summary judgment by Respondent Bobby Lumpkin is granted. Dkt 11.

Respondent's motion to direct Petitioner Jeremy Collins Collmorgen to plead facts necessary to invoke jurisdiction is granted *nunc pro tunc*. Dkt 10.

Collmorgen's petition for a writ of *habeas corpus* is dismissed with prejudice. Dkt 1.

1.  Background

In February 2015, Collmorgen was charged by indictment with aggravated sexual assault of a child, as follows:

> COUNT I
>
> . . . that JEREMY COLLINS COLL-MORGEN . . . on or about the 3rd day of August, 2013, and before the presentment of this indictment, in Waller County, Texas, did intentionally and knowingly cause the contact and penetration of the mouth of Maxwell, a child younger than six years of age, hereafter styled the Complainant, with the sexual organ of the Defendant.

COUNT II

. . . that JEREMY COLLINS COLL-MORGEN
. . . on or about the 3rd day of August, 2013, and
before the presentment of this indictment, in
Waller County, Texas, did intentionally and
knowingly cause the penetration of the anus of
Maxwell, a child younger than six years of age,
hereafter styled the Complainant, with the sexual
organ of the Defendant.

COUNT III

. . . that JEREMY COLLINS COLL-MORGEN
. . . on or about the 3rd day of August, 2013, and
before the presentment of this indictment, in
Waller County, Texas, did intentionally and
knowingly cause the penetration of the anus of
Maxwell, a child younger than six years of age,
hereafter styled the Complainant, with an
unknown object.

Dkt 12-19 at 8.

A jury found Collmorgen guilty of aggravated sexual
assault of a child in April 2018 before the 506th Judicial
District Court of Waller County, Texas. Dkt 12-7 at 54, 57.
The First Court of Appeals summarized the pertinent
factual background as follows:

On December 11, 2015, a grand jury indicted
appellant on three counts of aggravated sexual
assault of a child. Following voir dire, but prior to
presentment of the indictment, the State
abandoned Count II of the indictment. Appellant
pleaded not guilty to Counts I and III.

Maxwell, the complainant, was born on
November 4, 2007. . . . Maxwell's mother, Melinda,
began dating appellant while Maxwell was still an
infant. In September 2012, Melinda and Maxwell
moved in with appellant and appellant's parents.

On August 3, 2013, police responded to a report
of a domestic disturbance involving appellant and
Melinda. Melinda asked her friend, Jessica Turner,

2

if she and Maxwell could stay with her. Child Protective Services ("CPS") subsequently placed five-year old Maxwell in Turner's care while Melinda entered a rehabilitation program to seek treatment for drug addiction.

On November 5, 2013, while passing by her daughter's room, Turner heard Maxwell ask her daughter to show him her panties. Turner testified that she called Maxwell into the living room and asked him why he had asked her daughter that question and where he had learned it from. Maxwell replied, "Jeremy showed me." Turner testified that Maxwell became upset, began to cry, and dropped his head in embarrassment. Turner assured him that it was not his fault and that he was not in trouble. Turner stated that Maxwell said he was four years old when these incidents occurred, and that they occurred on multiple occasions. Maxwell told Turner that appellant pulled his own pants down and wiggled himself in front of Maxwell. Maxwell also told Turner that appellant touched Maxwell's genitals, penetrated his anus with a fork, and inserted a twisted piece of paper into his anus. Maxwell told Turner that appellant showed him pictures of naked men and women in a magazine. Maxwell also told Turner that appellant told him "don't tell your mother," and that when Maxwell tried to tell his mother about the abuse, she "wouldn't listen." Turner called CPS and law enforcement that same day.

On November 5, 2013, Deputy Bryan Mace with the Waller County Sheriff's Department talked with Turner. Based on the information Turner provided, Deputy Mace subsequently interviewed Turner at her home and obtained a written statement from her. He referred the case to his department for further investigation.

Sergeant Sharlonda Rutledge, an investigator with the Waller County Sheriff's Office, was

assigned to continue the investigation. After reviewing Turner's written statement, Rutledge scheduled a forensic interview of Maxwell.

On November 25, 2013, Maxwell was interviewed by Belkis Gonzalez, a forensic interviewer at the Fort Bend Children's Advocacy Center ("CAC") in Richmond, Texas. Rutledge watched the forensic interview via closed circuit television. At trial, which commenced on August 20, 2018, Rutledge testified that Maxwell disclosed to Gonzalez multiple acts of sexual abuse that occurred on multiple occasions beginning when he was five years old. Maxwell identified appellant as his abuser and stated that the abuse occurred inside and outside appellant's residence.

Gonzalez testified that Maxwell demonstrated that he understood the difference between telling the truth and telling a lie and that he promised to be truthful in the interview. Gonzalez used anatomical drawings of a boy's body to help Maxwell describe what happened to him. Maxwell drew pictures of the item "Jeremy put in [Maxwell's] butt" and of what Maxwell referred to as "butt and pee pee." Gonzalez testified that Maxwell made red markings on the anatomical diagram of the boy's body between the cheeks of the buttocks to indicate that he was touched "in" the butt. Gonzalez further testified that Maxwell drew a red circle around the penis of the child depicted in the drawing to indicate what he meant when he referred to being touched on his "private." On cross-examination, defense counsel asked Gonzalez whether a child who is scared of a caretaker might tell Gonzalez things in order to please the caretaker. Gonzalez acknowledged that children lie but stated that she asks questions that allow them to tell their own story. When asked whether she believed that a child could hear a story so often that the child actually believes it, Gonzalez stated that

it was possible. Maxwell's drawings and a video recording of his forensic interview were admitted into evidence without objection.

Rutledge interviewed Melinda on December 12, 2013. Melinda told Rutledge that she and Maxwell had lived with appellant until August 2013, and that Maxwell and appellant had a good relationship. Melinda also told Rutledge that appellant took care of Maxwell when Melinda went to work. Rutledge testified that Melinda admitted using cocaine and methamphetamine during the time period when she and Maxwell lived with appellant. Melinda told Rutledge that she frequently went in search of drugs, she was often gone for two to three hours, and appellant took care of Maxwell during her "drug runs."

On December 14, 2013, Rutledge called appellant and told him that she needed to speak to him regarding a criminal complaint made against him. On February 25, 2014, Rutledge interviewed appellant and told him about Maxwell's sexual abuse allegations against him. Appellant denied the allegations.

Following his forensic interview, Maxwell began seeing a therapist. Turner testified that while Maxwell was in therapy, she found pictures that Maxwell had drawn of "males and females and their genitals" and that "he was trying to draw them having sex together." Turner testified that Maxwell became angry and destructive after his disclosure of sexual abuse. Maxwell's behavior in Turner's home became increasingly disruptive and, as a result, Maxwell went to live with his maternal grandmother.

The State called Maxwell to testify. Maxwell stated that he viewed the video of his forensic interview the week before trial and that he told the truth during the interview. He stated that he recalled seeing the portion of the video where he

told Gonzalez that appellant had touched his "private" and touched him "back here." Using an anatomically correct doll, Maxwell indicated that when he told Gonzalez that appellant touched his private, he was referring to his penis, and when he told her that appellant touched his back, he was referring to his butt.

Maxwell also recalled telling Gonzalez that appellant put "the things you pick up a steak with" in [his] butt" and that "it hurt." Maxwell remembered telling Gonzalez that appellant penetrated his anus on more than one occasion with the handle of a butter knife and that it caused him "very large amounts of pain" and bleeding. Maxwell identified the anatomical drawings that he had colored in the forensic interview to indicate that appellant had put the tongs and butter knife "in his butt." Maxwell testified that appellant put his mouth on Maxwell's "private part," and he remembered feeling appellant's teeth. Maxwell identified the drawing where he had circled the penis to indicate where appellant placed his mouth.

Maxwell testified that Melinda witnessed appellant's sexual abuse of him and that he also told her about the incidents of abuse. Maxwell stated that his mother's response was to tell appellant "quit it" or to do nothing about it. When Maxwell told appellant to stop, appellant "said a lot of cuss words to me like the f word." Maxwell identified appellant at trial as the same person who placed his hands and mouth on his genitals and penetrated his anus with tongs and a butter knife.

Fiona Remko, Director of Fort Bend County CAC, testified about the procedures and protocols employed in conducting forensic interviews of children. Remko stated that a child's disclosure of sexual abuse can be purposeful or accidental. When asked whether a child who makes a concerning or inappropriate statement that is overheard by an

adult is making an accidental disclosure, Remko
replied, "[t]hat is the definition, pretty much, of
accidental disclosure." Remko also explained the
phenomenon of "script memory." She stated that a
child who has been abused on multiple occasions
has difficulty isolating a single abusive event.
Rather, she stated, the memories of the abuse get
jumbled in the child's mind making it extremely
unlikely that the child is going to be able to disclose
the abusive events in a linear manner. Remko
stated that children do not have perfect recall of
traumatic events because trauma negatively
affects the ability to remember.

On cross-examination, defense counsel asked
Remko whether she had ever interviewed a young
child who had been coached what to say. Remko
testified that she has experienced situations in
which a child had been coached but stated that it
normally happened with teenagers, not young
children. Remko testified that a forensic
interviewer can usually spot a child who has been
coached because the disclosure of abuse is lacking
in detailed, specific information. She further
testified that it is "incredibly difficult" for a child to
maintain a detailed lie about abuse over time.
Defense counsel asked Remko whether it was
possible for a child to lie about sexual abuse
because the child is afraid of the caregiver or
wanted to please the caregiver, and about the
length of time it takes for a child who has been
repeatedly told something before the child believes
it to be the truth. When asked whether she was
aware of any studies that had examined whether a
child can form a memory about something that
they have been told but that did not actually
happen, Remko testified that she was not aware of
any specific studies.

On re-direct examination, Remko discussed
markers or indicators of a child's truthfulness

7

during a forensic interview. She testified that a child who has experienced sexual abuse will be able to describe what it felt like as opposed to a child who has been coached to say someone touched him. Remko stated that, developmentally speaking, a child Maxwell's age should not have a concept of either oral sex or anal penetration, and that, if he does, it is normally indicative of having experienced something like that himself. Following Remko's testimony, the State rested its case-in-chief.

The defense called appellant's mother, Carolyn Collmorgen, as a witness. Carolyn testified that Maxwell and Melinda began living with appellant in September 2012. She testified that Maxwell called her "Meemaw" and her husband "Pawpaw," and that he called appellant "Daddy." She testified that, on several occasions, Melinda left for days without taking Maxwell with her and that appellant cared for Maxwell during her absence as well as when Melinda was working. Carolyn testified that appellant and Maxwell had a loving relationship and that she never witnessed appellant act inappropriately toward Maxwell. Following Carolyn's testimony, the defense rested.

The State informed the trial court that it wanted to call a rebuttal witness to present evidence of an unadjudicated extraneous offense involving appellant's abuse of a different child. In a hearing outside the presence of the jury, the prosecutor advised the court that it she was offering the extraneous offense evidence under Texas Rule of Evidence 404(b) and to rebut the defensive theory that Maxwell's disclosure of abuse was fabricated. Defense counsel objected to the evidence on the grounds that permitting the testimony would violate the trial court's standard discovery order, the evidence was not substantially similar to the charged offense, and the probative

value of the evidence was substantially outweighed by its prejudicial effect. The prosecutor responded that there was no discovery order in the case. The prosecutor also noted that the State had provided written notice of the proposed extraneous offenses fourteen days before trial, and that defense counsel had actual notice of the extraneous offenses because they were detailed in the offense reports entered into the District Attorney's Office's online discovery management system in April 2016, more than two years before trial. The trial court overruled defense counsel's objections to the extraneous offense evidence, finding that the State had provided reasonable notice before trial of such evidence and that there were substantial similarities between the charged offense and the proffered extraneous offense evidence. At defense counsel's request, the trial court agreed to give a limiting instruction to the jury regarding the extraneous offense evidence.

The State called Kaitlyn as a rebuttal witness. Kaitlyn, who was twenty-four years old at the time of trial, testified that appellant is her stepfather's brother. In 1999, when Kaitlyn was six years old, she lived on the Collmorgen property with her parents, Jordan, her brother who was eight or nine years old, and a younger sibling. Appellant lived on the same property during this time period.

Kaitlyn testified that appellant touched her inappropriately on multiple occasions when she was six years old. She testified that, on one occasion, appellant called her over and asked for a hug. Appellant put Kaitlyn in his lap, reached underneath her nightgown, and touched her vagina and buttocks with his hand. Kaitlyn also testified that she saw appellant touch Jordan inappropriately, and that while walking past Jordan's bedroom, she saw appellant touch Jordan's genital area with his hand. Kaitlyn

9

testified that appellant told her not to tell her mommy or daddy because appellant would go to jail. Kaitlyn immediately told her parents what had happened.

*Collmorgen v State*, No 01-18-00773-CR, 2020 WL 4210494, *1–5 (Tex App Houston [1st Dist.] July 23, 2020) (pet refd).

To protect the child victim's privacy, the appellate court used pseudonyms to refer to him and his family members. This Court will do the same—referring to the child victim as Maxwell and referring to the State's rebuttal witness as Kaitlyn.

The jury found Collmorgen guilty and sentenced him to life imprisonment on Counts I and III, to run concurrently, and imposed a $10,000 fine as to Count III. Dkt 12-7 at 54, 57. Count II was abandoned by the State after it rested during the guilt/innocence phase of trial, and after the defense filed a motion for a directed verdict. Dkt 12-4 at 101–03.

The First Court of Appeals affirmed Collmorgen's conviction in July 2020. *Collmorgen v State*, Appeal No 01-18-00773-CR, 2020 WL 4210494 (Tex App – Houston [14th Dist] July 23, 2020, pet refd).

The Texas Court of Criminal Appeals refused his petition for discretionary review on October 28, 2020. *Ex parte Collmorgen*, 2020 Tex Crim App LEXIS 894 (Tex Crim App).

Collmorgen then filed a state application for a writ of *habeas corpus* on December 6, 2021. Dkt 12-19 at 294. The Texas Court of Criminal Appeals denied it without written order on March 9, 2022. Dkt 12-17 at 1.

Collmorgen filed this federal petition for a writ of *habeas corpus* in June 2022. Dkt 1. He proceeds here *pro se*, contending that his conviction is void for the following reasons:

o His counsel, Ruby Parham, rendered ineffective assistance by (i) failing to object to the Child Advocacy Center video being played for the jury; (ii)

10

failing to impeach a State's witness; and (iii) failing to request an instruction for a lesser-included offense; and

○ His right to due process was violated when the prosecution knowingly used false and perjured testimony during the rebuttal phase of trial.

Dkt 1 at 6–14; Dkt 5-1 at 7–17.

Pending is a motion for summary judgment by Respondent, arguing that all claims are barred by limitations. Alternatively, Respondent argues that the claims lack merit and must be dismissed. Dkt 11 at 1. Collmorgen has responded. Dkt 17.

Respondent has submitted the trial transcript and other state-court records. Dkt 12.

2. Preliminary matters

a. "Next friend" status

Respondent argues that the Court may lack jurisdiction over the petition because another inmate, Jerry Lee Canfield, signed Collmorgen's petition and other filings on Collmorgen's behalf without first establishing "next friend" standing. Dkt 10 at 4.

Federal Rule of Civil Procedure 11 states, "Every pleading, written motion, and other paper must be signed . . . by a party personally if the party is unrepresented." In addition, the *habeas* statutes require that a *habeas* petition "be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf." 28 USC § 2242.

Section 2242 permits someone other than the petitioner to sign a *habeas* petition. But the Fifth Circuit holds that a non-lawyer acting on behalf of a prisoner "may not file a petition in every case in which the person actually detained might file a petition." *Weber v Garza*, 570 F2d 511, 513 (5th Cir 1978, *per curiam*). Instead, a non-lawyer may sign and file a *habeas* petition on behalf of someone else only when the petition "establishes some reason or explanation, satisfactory to the court, showing: (1) why the detained person did not sign and verify the petition, and (2)

11

the relationship and interest of the would-be 'next-friend.'" Id at 513–14. The petition must also "set forth an adequate reason or explanation of the necessity for resort to the 'next friend' device." Id at 514. Examples of the necessary use of a "next friend" include an "[i]nability to understand the English language or the situation, particularly in the case of aliens, impossibility of access to the person, or mental incapacity." Id at 514 n 4.

The "next friend" has the burden to establish that his status is proper. See *Whitmore v Arkansas*, 495 US 149, 164 (1990). If the petitioner doesn't satisfy these requirements, the court has no jurisdiction to consider the petition. See *Weber*, 570 F2d at 514.

Respondent argues that Canfield hasn't provided any explanation as to the basis of his authority to execute documents on Collmorgen's behalf. Dkt 10.

Canfield states that he himself deposited Collmorgen's petition in the mail on April 18, 2022, while Canfield was housed in the Coffield Unit. Collmorgen was housed in the Ferguson Unit at the time. Canfield explains that Collmorgen has a limited access to the courts, a lack of education, and zero understanding of the law, all of which prevents him from filing a meaningful appeal, much less a timely petition. Canfield had assisted Collmorgen on his post-conviction remedies from the state *habeas* proceedings through the present federal proceedings while Collmorgen was on the Coffield Unit, and gained his permission and consent to sign for him while he was still on the Coffield Unit. Collmorgen's custody level was increased from a G3 to G4 custody level and transferred to another unit due to staffing issues. Canfield acknowledged that he was filing Collmorgen's state *habeas* application on his behalf, and states that if he hadn't assisted Collmorgen, his *habeas corpus* petition would have been time-barred pursuant to the AEDPA. Dkt 13.

Canfield has satisfactorily explained why Collmorgen didn't sign and verify the petition, along with his relationship and interest in assisting Collmorgen. Dkt 13 at 3. The burden to show "next friend" status is met. See

*Whitmore v Arkansas*, 495 US 149, 164 (1990). Jurisdiction to consider the petition is thus proper. See *Weber*, 570 F2d at 514.

### b.  Limitations

Respondent suggests that Collmorgen's petition is barred by limitation because it isn't clear when he filed his federal petition.

The Anti-Terrorism and Effective Death Penalty Act of 1996 imposes a one-year statute of limitations for federal *habeas corpus* petitions. The statute provides in part:

> (1) A 1-year period of limitation shall apply to an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 USC § 2244(d)(1).

Most directly at issue here is § 2244(d)(1)(A), pertaining to limitations running from judgment finality at the conclusion of direct review. The Fifth Circuit explained in *Roberts v Cockrell* that "a decision becomes final by the conclusion of direct review or the expiration of the time for seeking such review." 319 F3d 690, 694 (5th Cir 2003) (cleaned up). Absent appeal to the state's highest court, judgment becomes final when the time for seeking such review expires. *Gonzalez v Thaler*, 565 US 134, 137 (2012) (cleaned up).

But even after a judgment becomes final in state proceedings, the limitations period under § 2244(d)(1)(A) doesn't proceed inexorably forward. AEDPA instead provides, "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 USC § 2244(d)(2). And so the clock that ticks onward pursuant to § 2244(d)(1)(A) is paused to the extent and during the time period to which § 2244(d)(2) applies.

Collmorgen was convicted and sentenced on August 24, 2018. His petition for discretionary review was refused by the Texas Court of Criminal Appeals on October 28, 2020. Collmorgen's conviction became final ninety days later on January 26, 2021, when his time to file a petition for writ of *certiorari* expired. The federal statute of limitations for Collmorgen's petition thus closed one year later, on January 26, 2022, unless he had properly filed an application for State post-conviction or other collateral review to toll the running of the limitations period. 28 USC § 2244(d)(2).

Collmorgen filed his state *habeas* application on or about December 6, 2021. The CCA denied this application without written order on March 9, 2022. Therefore, it tolled Collmorgen's federal filing deadline for ninety-three days. When ninety-three days were added to his filing deadline, Collmorgen's federal petition was due on April 29, 2022.

14

Collmorgen asserts that he originally filed his federal petition by placing it in the prison mail system on April 18, 2022. Dkt 1 at 19. Respondent points to the outgoing legal mail log kept at the Ferguson Unit, where Collmorgen was housed at the time, and argues that there was no outgoing legal mail from Collmorgen received in the prison mail room at any point between April 8, 2022, and May 5, 2022.

This discrepancy is perhaps explained by the fact that another inmate, Jerry Lee Canfield, placed the petition in the prison mail system from the Coffield Unit. Regardless, Collmorgen has provided a USPS tracking number which, when searched through the online tracking application, shows that a mailing was delivered in Houston, Texas, to a front desk/reception/mail room on April 22, 2022. Dkt 11-3 at 2. Collmorgen asserts that the Court acknowledged its receipt of this federal petition, but that the Court later couldn't locate it—thus requiring him to re-mail a copy of the same federal petition. Dkt 1 at 19.

The Court is satisfied that Collmorgen's petition was placed in the prison mail system on April 18, 2022, but was later unable to be located after delivery. As such, it is here determined that Collmorgen filed his federal petition with the assistance of his next friend, Canfield, on April 18, 2022. Collmorgen's petition is thus timely.

### 3. Legal standard

#### a. AEDPA

A *pro se* petition is construed liberally and isn't held to the same stringent and rigorous standards as pleadings filed by lawyers. See *Martin v Maxey,* 98 F3d 844, 847 n 4 (5th Cir 1996). Even so, the Antiterrorism and Effective Death Penalty Act, 28 USC § 2241, *et seq*, governs this federal petition for *habeas corpus*. See *Woodford v Garceau*, 538 US 202, 205–08 (2003). This has consequences for the standard of review as to disputed questions of both law and fact.

*As to disputed questions of law,* AEDPA bars federal relief based upon claims that were adjudicated on the merits by state courts unless the decision of the state court

"was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 USC § 2254(d); see also *Early v Packer*, 537 US 3, 7–8 (2002); *Cobb v Thaler*, 682 F3d 364, 372–73 (5th Cir 2012). The Fifth Circuit holds that a state-court decision is *contrary to clearly established federal law* "if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v Epps*, 616 F3d 436, 439 (5th Cir 2010), citing *Williams v Taylor*, 529 US 362, 404–08 (2002). And the Fifth Circuit holds that *an unreasonable application of federal law* means that the decision is "unreasonable, not merely wrong; even clear error will not suffice." *Escamilla v Stephens*, 602 F Appx 939, 941 (5th Cir 2015, *per curiam*), quoting *White v Woodall*, 572 US 415, 419 (2014). This is a high bar. To surpass it, a petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v Donald*, 575 US 312, 316 (2015), quoting *Harrington v Richter*, 562 US 86, 103 (2011).

*As to disputed questions of fact,* AEDPA precludes federal relief unless the adjudication by the state court of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 USC § 2254(d)(2); see also *Martinez v Caldwell*, 644 F3d 238, 241–42 (5th Cir 2011). A state court's factual determinations are "presumed to be correct" unless the petitioner rebuts those findings with "clear and convincing evidence." 28 USC § 2254(e)(1). This presumption extends to express factual findings as well as implicit or "unarticulated findings which are necessary to the state court's conclusion of mixed law and fact." *Murphy*

16

*v Davis*, 901 F3d 578, 597 (5th Cir 2018), quoting *Valdez v Cockrell*, 274 F3d 941, 948 n 11 (5th Cir 2001).

A federal court reviewing a petition for writ of *habeas corpus* may only consider the factual record that was before the state court when determining the reasonableness of that court's findings and conclusions. *Cullen v Pinholster*, 563 US 170, 180–81 (2011). And the Supreme Court instructs that the reviewing court "may not characterize these state-court factual determinations as unreasonable 'merely because [it] would have reached a different conclusion in the first instance.'" *Brumfield v Cain*, 576 US 305, 313–14 (2015), quoting *Wood v Allen*, 558 US 290, 301 (2010). To the contrary, § 2254(d)(2) requires the federal court to "accord the state trial court substantial deference." *Brumfield*, 576 US at 314.

A petitioner seeking a writ of *habeas corpus* must also demonstrate injury of a certain character. To warrant relief based on state-court error, a petitioner must show the alleged error had "substantial and injurious effect." *Brecht v Abrahamson*, 507 US 619 (1993); for example, see *Hughes v Quarterman*, 530 F3d 336, 345 (5th Cir 2008). This high bar isn't met where evidence of the defendant's guilt is overwhelming. *Burgess v Dretke*, 350 F3d 461, 472 (5th Cir 2003). There must be more than a mere reasonable possibility that it contributed to the verdict. *Brecht*, 507 US at 638. But where a court is confident that the error caused grave harm—or even if the record is evenly balanced in this regard—the petitioner is entitled to relief. See *Fry v Pliler*, 551 US 112 n 3 (2007), citing *O'Neal v McAninch*, 513 US 432, 435 (1995); see also *Robertson v Cain*, 324 F3d 297, 305 (5th Cir 2003).

### b. AEDPA and Rule 56

The Fifth Circuit holds that Rule 56 of the Federal Rules of Civil Procedure "applies with equal force in the context of habeas corpus cases." *Clark v Johnson*, 202 F3d 760, 764 (5th Cir 2000). But where Rule 56 and the rules governing *habeas corpus* petitions conflict, the latter controls. *Austin v Davis*, 647 F Appx 477, 483 (5th Cir 2016, *per curiam*). As such, the presumption of correctness

17

mandated by § 2254(e)(1) "overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party." *Austin*, 647 F Appx at 483 (citation omitted); cf *Anderson v Liberty Lobby*, 477 US 242, 255 (1986) (stating typical summary-judgment standard in civil cases).

An articulated opinion from a state court has natural pertinence to resolution of disputed questions of both law and fact on *habeas corpus* review. But some state-court decisions reach a conclusion without such articulation. What then? The Fifth Circuit holds, "When faced with a silent or ambiguous state habeas decision, the federal court should 'look through' to the last clear state decision on the matter." *Jackson v Johnson*, 194 F3d 641, 651 (5th Cir 1999), quoting *Lott v Hargett*, 80 F3d 161, 164 (5th Cir 1996). This is because a presumption exists that later, unexplained orders rejecting a federal claim are decided on the same basis as earlier, reasoned orders resting upon the same ground. *Ylst v Nunnemaker*, 501 US 797, 803 (1991). This also accords with decisional practice of the Texas criminal courts. The Texas Court of Criminal Appeals holds that a statement of *denial* of a state application for a writ of *habeas corpus* without written order signifies an adjudication that the court below reached the correct ruling on the merits—as compared to a statement of *dismissal*, which means only that the claim was declined on grounds other than the merits. *Ex parte Torres*, 943 SW2d 469, 472 (Tex Crim App 1997, *en banc*); see also *Singleton v Johnson*, 178 F3d 381, 384 (5th Cir 1999).

Even so, the state court's decision will at times be unaccompanied by explanation, with no level of review having issued a reasoned opinion. The Supreme Court holds in such situations that "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 US at 98; see *Salts v Epps*, 676 F3d 468, 480 n 46 (5th Cir 2012) (applying *Harrington*).

18

4. Ineffective assistance of counsel

Collmorgen asserts that his trial counsel, Ruby Parham, was ineffective in failing to (i) object to the Child Advocacy Center video being played for the jury; (ii) impeach a State's witness; and (iii) request an instruction for a lesser-included offense.

Collmorgen must demonstrate both *deficient performance* and ensuing *prejudice* to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984); see also *Charles v Stephens*, 736 F3d 380, 388 (5th Cir 2013). "Both the *Strickland* standard and the AEDPA standard are highly deferential, and when the two apply in tandem, review is doubly so." *Charles*, 736 F3d at 389 (cleaned up); see also *Harrington*, 562 US at 105.

To establish *deficiency*, the petitioner must show that the performance by trial counsel fell below an objective standard of reasonableness based on "prevailing norms of practice." *Loden v McCarty*, 778 F3d 484, 494 (5th Cir 2016). In that regard, courts should be "highly deferential" to counsel. *Strickland*, 466 US at 689. This means that "counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment." Id at 690. This is particularly true as to "strategic choices made after thorough investigation of law and facts relevant to plausible options," which are "virtually unchallengeable." Id at 690–91. "*Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose." *Moore v Johnson*, 194 F3d 586, 615 (5th Cir 1999). But beyond this, the Fifth Circuit has described the deficient-performance standard as requiring counsel to have "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client." *Jones*, 287 F3d at 331. Simply because counsel's strategy wasn't successful doesn't

mean counsel's performance was deficient. *Avila v Quarterman*, 560 F3d 299, 314 (5th Cir 2009).

To establish *prejudice*, the petitioner must show a reasonable probability that—absent the deficient performance—the outcome of the proceedings would have been different. *Reed v Stephens*, 739 F3d 753, 773 (5th Cir 2014), quoting *Strickland*, 466 US at 687. In this context, a *reasonable probability* is one that is sufficient to undermine confidence in the outcome of the proceedings. *Strickland*, 466 US at 694.

### a.  Admission of the video

Collmorgen argues that Parham failed to object to the playing of the Child Advocacy Center video before the jury. He contends that it wasn't necessary for the jury to view it because Maxwell was present, available, and testified at trial. Dkt 1 at 6–8. He also claims that admission of the video was a violation of the Confrontation Clause and Tex Code of Crim Proc art 38.071. While Collmorgen refers to this as the *CSC video*, it will be referred to with the same label used at trial, being the *CAC video*.

*As to failure to object,* Belkis Gonzalez conducted the forensic interview with Maxwell on November 25, 2013, and testified as to its authenticity. Parham didn't object to admission of the video at trial, but instead strategically agreed upon it. Dkt 12-3 at 109. Her strategy of attacking the credibility of both Maxwell and Gonzalez is apparent from her opening argument:

> MRS. PARHAM: As you go through all of this evidence, it comes down to the credibility of Maxwell because that is the only witness that is making any allegations as to what occurred. As this progresses, the State has told you that on August 3rd, he left with his mother, from Mr. Collmorgen; and up to that point, Mr. Collmorgen had been the only dad he ever knew since he was an infant. There had been times throughout those years that he had left for a period of time, and you are going to learn that one of those times was just prior to

August 3rd. He was gone for about six months, came back and the drugs got in the way of good common sense on August 3rd, and Melissa left. Three months later, Mrs. Turner called officers. And Ms. Turner told the officer that Mason was drawing inappropriate pictures, pictures little children should not know. And that he had been touched by Mr. Collmorgen's hand and a fork. That was the extent of even Ms. Turner's outcry at that point. She does say that he had been exposed to porn, and that Mr. Collmorgen had exposed himself. And I am going to tell you that through everything you hear, those issues are never raised by Mason. That interview with Officer Mace was followed up with the forensic interview by the Child Advocacy Center. These are people that are supposed to be able to talk to a child, not direct their statements, and get statements from the children; and Mason says we are here because we can't live there any more because he did something bad to me. They weren't there. The evidence is going to tell you because he and Jessica got into a fight on August 3rd. But Mason doesn't believe that is the case. He believes that he did something bad or that Mr. Collmorgen did something bad with him and he will explain that to you in the child interview. He doesn't know his birth date but he knows this happened when he was five years old. He knows it was the first day he was there. And on the first day it was there, he got a DS video, which has been taken away from him, he says, by Mr. Collmorgen. The interviewer, instead of asking questions that are allowing the child to tell what is going on, asked him which part of his body, talking to about Mr. Collmorgen, did he touch you with? And the answer came back, I believe to that question was, with his hand. She didn't give him an option to say what did he touch you with? And that is going to come back in other statements

Mason makes. He doesn't know his birthday but he says this happened at 11:30. He also says that Mr. Collmorgen kicked him in the eye. He also says that everybody was in the house, but they were outside in the front yard; and you are going to hear testimony that the front yard is openly exposed to the road that they live on, no vegetation line impedes sight. You are going to hear Mason say in this interview that he remembers being touched while he was sleeping, and at some point he is asked, how can you remember that? And he says, well, I got a big brain. He is gonna talk about being made to sleep on the ground. And then he talks about being touched on the butt. And he says, I was touched. I was poked. What did it feel like? It was tapping. What else did he do? Well, he put the -- these are with tongs, like barbecue tongs, like you would take and turn a steak with; and he explains they have finger holes to them and he got them from the barbecue pit, that he was tapped on the butt. It felt like tapping, and then he put it to my mouth and what did he, Mr. Collmorgen say when this was happening? And he said Mr. Collmorgen said, what did you say? The whole description sounds like a light paddling. What did you say? You know better than that, don't, don't say things like that. But the interviewer, four times, said where in your butt did he put those? Where in your butt? And Mason keeps saying on the side, then he put them to my lips and finally after the third time the word in is used, Mason adopts it; and then the interviewer says, well, was this inside or outside your butt? Which gives Mason no choice but to make a decision. Mason says, in this interview, makes no outcry in this interview that anything else has happened. He continues to say and that is it. And then she says, well, so has anyone ever put their mouth on you? Well, yeah, Jeremy did. Well,

tell me about it. Well, I don't remember anything about it.

Then he says he felt his teeth, then he goes through a hand gesture that the State is going to tell you is a sucking motion and a slurping motion. I am going to tell you, watch his hand. It's round and he is doing this and he is saying chomp, chomp, chomp. He is making a biting motion.

When they asked did you ever put your mouth on anybody, he said, my friends don't do that. No. That never happened. And my Aunt Jessica says Jeremy is going to jail. Remember, Aunt Jessica, the one that said that he was touched with a fork, and Mason never says anything about a fork.

Remember the obscene photos that were never produced and Maxwell says nothing about drawing pictures like that. That was on November 25th, approximately twenty days after the original call to the sheriff's office.

December 10th, fifteen days later, he goes for a forensic interview and again, this is a professional that has learned how to talk to children. He calls Mr. Collmorgen a stranger, that he is dumb, that he doesn't know anything about kids. This is a man he has lived with all his life, that he is now calling a stranger. He says he touched my privates in front and in back and that is it. It was about six weeks ago. And he has been out of the home for three months.

I am not questioning the fact that this child doesn't have a special, spatial relationship but the aunt says a year ago he said at 11:30, now he is saying six weeks ago, during the morning while mom was sleeping. We were outside and when he took me outside, he took that long tool that you use to cut the grass, a weedeater, and he weeded and -- he didn't say weeded. He moved it around my legs, around and around my legs. He says he touched his

private with a stick one time, not with barbecue tongs from fifteen days ago, not with a knife that he claims fifteen days ago he was stabbed multiple times, in the CAC interview, with a knife; and when you actually see the CAC interview, watch the motions.

The evidence is going to show you that he doesn't ever discuss being unclothed. He says he grabbed my waistband and pulled it, which is consistent with grabbing a kid by the belt and popping their rear with tongs. He said it didn't even hurt.

When you, when looking at the forensic examination, there are some well healed scars around his knees and his ankles. No scars on his legs. No trauma to any other part of his body. No evidence that he has ever been kicked in the eye, scarred in the eye. No evidence that he has ever been stabbed. No evidence that a weedeater has shredded his legs.

The other thing that he tells you in the CAC interview, when he is asked is there anyone you are afraid of, he says, Aunt Jessica. I want you to listen, evaluate what is being said by this child. I have no doubt he believes every bit of it. Some of it, with medical evidence that is available, is just physically impossible. That is what the evidence is going to show you.

I hate that this has been done to Maxwell. I hate that we are here, but it's the only defense an innocent person has.

Dkt 12-3 at 17–22.

Parham's strategy was to discredit the testimony of the forensic interviewer or further question the techniques used by the forensic interviewer. Parham cross-examined the interviewer as to whether the language used by the interviewer during the forensic interview may have been suggestive. Dkt 12-3 at 128–29. Parham relied on the CAC

video when cross-examining Maxwell at trial in order to cast doubt as to his memory. Dkt 12-4 at 59–61, 63–64.

Parham is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. Parham made a strategic and informed decision to allow admission of the CAC video. Collmorgen hasn't demonstrated both *deficient performance* and ensuing *prejudice* to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984).

*As to the Confrontation Clause,* the Sixth Amendment of course guarantees to the accused an ability to confront witnesses against him. "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross examine." *Crawford v Washington*, 124 S Ct 1354, 1369 (2004). However, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Id at 1369 n 9, citing *California v Green,* 90 S Ct 1930, 1937 (1970).

The record reflects that Maxwell testified at trial and was subject to cross-examination. Dkt 12-4 at 56–64. Similarly, the interviewer's out-of-court statements in the CAC video don't present a confrontation problem because she also testified at trial and was subject to cross-examination. Dkt 12-3 at 127–31; *McClaren,* 13 F4th at 416. As such, any objection by Parham on such ground would have been frivolous, and counsel isn't required to file frivolous motions or make frivolous objections. *Green v Johnson,* 160 F3d 1029, 1037; *McCoy v Lynaugh,* 874 F2d 954, 963 (5th Cir 1989).

Collmorgen fails to show that the state court's rejection of his Confrontation Clause claim was an unreasonable determination of the facts based on the evidence in the record or was contrary to, or an unreasonable application of, established Federal law as determined by United States Supreme Court precedent. 28 USC § 2254(d).

*As to violation of Texas law,* Collmorgen relies on Tex Code of Crim Proc art 38.071. He contends that the CAC video was erroneously admitted under Texas law and that Parham should have challenged the trial court's ruling.

This allegation was raised and rejected without written order during Collmorgen's state *habeas* proceedings. The state *habeas* court thus implicitly determined that Maxwell's testimony was permissible under state law. That conclusion cannot be addressed on a petition seeking federal *habeas* relief. See *Charles v Thaler*, 629 F3d 494, 500–01 (5th Cir 2011) (stating that "federal court lacks authority to rule that a state court incorrectly interpreted its own law"); *Young v Dretke*, 356 F3d 616, 628 (5th Cir 2004) (declining to review determination by state *habeas* court of validity of Texas statute under Texas constitution in context of *Strickland* claim). It simply isn't the function of federal courts to review a state's interpretation of its own law. *Bradshaw v Richey*, 546 US 74 (2005).

The Texas Court of Criminal Appeals rejected Collmorgen's claim based on Tex Code of Crim Proc art 38.071. Dkt 12-19 at 275–76; Dkt 12-17 at 1. This rejection required an implicit state law determination to resolve the *Strickland* claim at issue. That interpretation of Tex Code of Crim Proc art 38.071 commands deference in this context.

Collmorgen isn't entitled to *habeas* relief on this claim.

### b.   Failure to impeach rebuttal witness

Collmorgen claims that Parham rendered ineffective assistance by failing to impeach Kaitlyn. Dkt 1 at 6, 8–9. He argues that Parham (i) should have shown that her testimony about past sexual abuse was false, (ii) should have presented evidence that a prior criminal case stemming from Kaitlyn's allegations against him was ultimately dismissed after Kaitlyn's father signed a non-prosecution affidavit. Dkt 1 at 8–9. He maintains that if Parham had impeached Kaitlyn's testimony, there's a reasonable probability that the outcome would have been different.

Parham filed objections to the case of the extraneous offenses before trial, along with a motion for continuance due to the extraneous offenses alleged by Kaitlyn. She also focused on excluding the extraneous offense during trial. During a hearing outside the presence of the jury, Parham presented reasons for excluding Kaitlyn's testimony. Dkt 12-5 at 3–18. Collmorgen complains that Parham should have discredited Kaitlyn on the stand.

Collmorgen offers Kaitlyn's father's statement of non-prosecution signed in 2002. Dkt 1 at 9; Dkt 5-1 at 24. There, Jessie Collmorgen, Sr, stated:

> On this date JANUARY 15, 2002, at 2:20 PM, JESSE RAY COLLMORGEN appeared at the Waller County Sheriff's Office and voluntarily gave the following statement:
>
> . . .
>
> On or about 12/12/00, I made a complaint at the Waller County Sheriff's Office against JEREMY COLLMORGEN alleging the offense of INDECENCY WITH A CHILD which occurred in Waller County and the offense is currently pending prosecution in Waller County, Texas.
>
> I do not wish for JEREMY COLL-MORGEN to be further prosecuted. It is my request that the prosecution be dismissed, and I do not want to testify against the person, although I understand that I may be compelled by legal process do so even though it is against my wishes.
>
> I am making this request for non-prosecution because: MY FAMILY AND I HAVE COME TO AN AGREEMENT THAT IF THIS COULD BE DROPPED JEREMY WOULD BE MOVED OUT OF TOWN. THAT WAY IF IT DID HAPPEN HE WOULD BE OUT OF THE WAY OF MY KIDS. ALSO I TIRED OF ARGUING WITH MY FAMILY ALL THE TIME ABOUT WHO IS RIGHT AND WHO IS WRONG. I WANT TO STOP THE FIGHTING. IF THIS DOES CONTINUE TO GO

27

> TO COURT I WILL LOSE THE PROPERTY I AM
> LIVING ON BECAUSE MY FOLKS WOULD
> HAVE TO SELL THE PROPERTY IN ORDER TO
> PAY THE LAWYER. I DO NOT WANT MY
> CHILDREN TO HAVE TO BE ON THE STAND
> AND SHERRY ROBINSON SAID THEY WOULD
> HAVE TO TESTIFY.

Dkt 5-1 at 24.

In reviewing a state court's merits adjudication for reasonableness, a federal court is limited to the record that was before the state court. § 2254(d)(2); *Cullen v Pinholster*, 563 US 170, 181 (2011). Respondent argues that Collmorgen didn't present this document to the state *habeas* court. Dkt 11. Review of the state *habeas* record confirms this fact. As such, it can't be considered in reviewing the merits of his federal claims.

To the extent that Collmorgen claims that the statement of non-prosecution was presented to the state *habeas* court, he doesn't specify where this document was made a part of the state *habeas* record. To the extent that he further asserts that the Waller County District Attorney has a separate affidavit by Jessie Collmorgen signed in 2006, purportedly explaining that he signed the statement of non-prosecution because he didn't believe his children, it again isn't specified as being part of the state *habeas* record. Dkt 17 at 9.

Regardless Collmorgen's claim would fail even if the document could properly be considered.

Collmorgen argues that the statement of non-prosecution contained impeachment evidence. He claims that it contained a statement that Jesse Ray Collmorgen signed the non-prosecution affidavit because he didn't believe his children's allegations of sexual abuse. But a review of the only submitted document shows that Jessie Collmorgen never said that he didn't believe his children. He said he was tired of fighting with his family, fearing having to move off the property where they were living, and didn't want his children to have to testify. Dkt 5-1 at 24.

He made no statement as to the credibility of his daughter's allegations of sexual abuse. And it certainly didn't contain any recantation by Kaitlyn herself.

Parham could also have reasonably decided not to present the statement of non-prosecution because the jury would have heard about the devastating consequences Collmorgen's abuse caused for Katlyn and the entire family. As the Supreme Court has recognized, "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 US at 689. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation," but "to ensure that criminal defendants receive a fair trial." Ibid. Thus, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id at 688.

Collmorgen also argues that a single decision by Parham not to impeach a witness was deficient performance. But he doesn't support this claim with evidence sufficient to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id at 689 (quotations omitted). And indeed, the jury ultimately heard testimony about the statement of non-prosecution and that the charges against Collmorgen had been dismissed, which the prosecutor elicited upon cross-examination of Collmorgen's mother, Carolyn Collmorgen. Dkt 12-5 at 50–54.

Collmorgen fails to demonstrate that had the existence of the non-prosecution affidavit been introduced during Kaitlyn's testimony, the result of the proceeding would have been different. *Strickland,* 466 US at 694. Therefore, he fails to demonstrate *Strickland* prejudice. Ibid.

Collmorgen also argues that, in the context of Kaitlyn, no prosecutor would dismiss allegations of child sexual abuse; rather, a prosecutor would compel a witness to testify against their own will to see that justice is complete. Dkt 1 at 9. He also alleges that no father would put tangible

objects before his child in such a scenario. Ibid. These allegations are conclusory and inadequate to entitle Collmorgen to federal *habeas* relief. *Koch v Puckett,* 907 F2d 524, 530 (5th Cir 1990) (holding that "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue") (quotations omitted).

Parham made a conscious and informed decision not to impeach Kaitlyn. Collmorgen hasn't demonstrated either *deficient performance* or *ensuing prejudice*, and thus fails to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984).

### c.   Lesser-included-offense instruction

Collmorgen asserts that Parham rendered ineffective assistance by failing to request a jury instruction on the lesser-included offenses of indecency with a child or injury to a child. Dkt 1 at 11, 13–14. Considered first will be whether Collmorgen was even entitled to a jury instruction on the lesser-included offense. Only then will it be considered whether Parham rendered ineffective assistance by failing to request such instruction.

*As to entitlement to instruction on a lesser-included-offense instruction,* it is a matter of state law. Texas courts use a two-pronged test to determine whether a lesser included offense must be included in the jury charge when requested by a defendant. *Bullock v State*, 509 SW3d 921, 924 (Tex Crim App 2016). The first prong, whether an offense is a lesser included offense, is a question of law. Ibid. If it is a lesser included offense as a matter of law, the second prong is whether some evidence exists in the record that would permit a rational jury to find that, if the defendant is guilty, she is only guilty of the lesser offense. Id at 924–25; for example, see *Hall v State*, 225 SW3d 524, 535–36 (Tex Crim App 2007); *Rousseau v State*, 855 SW2d 666, 673 (Tex Crim App 1993); *Royster v State*, 622 SW2d 442, 446 (Tex Crim App 1981); *Torres v State*, 343 SW3d 297, 304 (Tex App—Eastland 2011, pet refd).

To determine whether the first prong is met, Texas courts look to the statutory elements of the offense actually

charged in the indictment and the statutory elements of the alleged lesser-included offense. *Jacob v State,* 892 SW2d 905, 907–08 (Tex Crim App 1995).

Here, as to injury to a child, it doesn't meet this first prong, for aggravated sexual assault of a child doesn't require proof of bodily injury. Compare Tex Penal Code § 22.021, with Tex Penal Code § 22.04. This means third things in turn. First, injury to a child isn't a lesser-included offense of aggravated sexual assault of a child. Second, Collmorgen wasn't entitled to an instruction on injury to a child as a lesser included offense. Third, Parham wasn't required to file a motion for its inclusion because such motion would have been frivolous.

But as to indecency with a child, it is a lesser included offense of aggravated sexual assault of a child, at least where both offenses are predicated on the same act. *Evans v State*, 299 SW3d 138, 143 (Tex Crim App 2009). And so inquiry must proceed to the second prong and to consideration whether there was evidence permitting a rational jury to find that, if Collmorgen is guilty, he is guilty only of the lesser offense. *Rousseau*, 855 SW2d at 673; *Torres*, 343 SW3d at 304. Collmorgen argues that the record contains "some evidence" of the lesser included offense that would permit a rational jury to find him guilty only of the lesser offense.

The First Court of Appeals found the evidence against Collmorgen to be legally sufficient to affirm his conviction for aggravated sexual assault of a child. It reasoned:

> The statute criminalizing aggravated sexual assault of a child sets forth several distinct offenses. *Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App. 1999). A person may commit an aggravated sexual assault of a child in several ways, including by intentionally or knowingly (1) causing the penetration of the anus or sexual organ of a child by any means or (2) causing the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor, if the child is younger than 14 years of

age, regardless of whether the person knew the child's age. *See* Tex. Penal Code § 22.021(a)(1)(B), (a)(2)(B); *Prestiano v. State*, 581 S.W.3d 935, 941 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). Here, Counts I and III of the indictment alleged that appellant did intentionally and knowingly "cause the sexual organ of [Maxwell], a child younger than six years of age, to contact or penetrate the mouth of [appellant]" and "cause the penetration of the anus of [Maxwell] ... with an unknown object."

. . .

At trial, Maxwell testified that he knew the difference between telling the truth and telling a lie and he promised to answer truthfully the questions asked of him. He acknowledged that he viewed the video of his forensic interview a week prior to trial and that he told the truth during the interview. Maxwell identified the "middle of his body" and his butt as private body parts that no one should touch. He recalled seeing the portion of the video where he told Gonzalez that appellant had touched his "private" and touched him "back here." Using an anatomically correct doll, Maxwell indicated that when he told Gonzalez that appellant touched his private, he was referring to his penis, and when he told her that appellant touched his back, he was referring to his butt. Maxwell recalled telling Gonzalez that appellant put "the things you pick up a steak with in [his] butt" and that "it hurt." Maxwell also remembered telling Gonzalez that appellant penetrated his anus on more than one occasion with the handle of a butter knife, and he described the acts of penetration as causing him "very large amounts of pain" and bleeding. Maxwell identified the anatomical drawings that he had colored to indicate that appellant had put the tongs and butter knife "in his butt." Maxwell testified that

appellant put his mouth on Maxwell's "private part" and he remembered feeling appellant's teeth. Maxwell identified the drawing where he had circled the penis to indicate where appellant placed his mouth.

Appellant argues that the evidence is insufficient because Maxwell is the only source of the allegations against him and none of the State's witnesses saw appellant sexually assault Maxwell. A child sexual assault complainant's uncorroborated testimony, standing alone, is sufficient to support a defendant's conviction. *See* Tex. Code Crim. Proc. art. 38.07 (stating conviction for sexual assault is supportable on uncorroborated testimony of victim if victim informed any person, other than defendant, of offense within year, but requirement does not apply if at time of alleged offense victim was person seventeen years of age or younger); *Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App. 2005); *Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). Thus, Maxwell's testimony alone was sufficient to support appellant's conviction. *See* Tex. Code Crim. Proc. art. 38.07(b)(1); *Gonzales v. State*, 522 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (uncorroborated testimony of child victim alone was sufficient to support conviction of aggravated sexual assault of child); *Johnson v. State*, 419 S.W.3d 665, 671–72 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (same). Further, the State has no burden to produce physical or other corroborating evidence; rather, the jury determines the credibility of the witnesses and may "believe all, some, or none of the testimony[.]" *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

However, Maxwell's testimony was corroborated by other evidence as well. Turner, the State's first outcry witness, testified that when she

33

asked Maxwell whether appellant had touched his body, Maxwell gestured toward his genitals and anus. Article 38.072 of the Texas Code of Criminal Procedure allows the admission of a hearsay statement made to an outcry witness by certain abuse victims, including children under the age of fourteen who are victims of a sexual offense. *See* Tex. Code Crim. Proc. art. 38.072.

Maxwell told her that appellant touched his genitals, penetrated his anus with a fork, and inserted a twisted piece of paper into his anus. Turner stated that Maxwell told her that the sexual abuse occurred on multiple occasions. Gonzalez, the State's second outcry witness, identified and authenticated the video recording of her forensic interview of Maxwell, the anatomical drawings she used during the interview, and a copy of the drawings Maxwell made of the items appellant "put in his butt" and of what Maxwell referred to as "butt and pee pee." The recording was admitted into evidence and published in its entirety to the jury. Gonzalez testified that Maxwell made red markings on the anatomical diagram of the boy's body between the cheeks of the buttocks to indicate that he was touched "in" the butt. She testified that Maxwell also drew a red circle around the penis of the child depicted in the drawing to indicate what he meant when he referred to being touched on his "private."

Based on the evidence presented, and viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational jury could have found beyond a reasonable doubt that appellant committed the offense of aggravated assault of a child as alleged in the indictment. *See Gonzales*, 522 S.W.3d at 57. We overrule appellant's second point of error.

*Collmorgen v State*, No 01-18-00773-CR, 2020 WL 4210494 (Tex App—Hous [1st Dist] July 23, 2020) (pet refd).

The entire record has been examined, and the evidence has been outlined above. It is here determined that no evidence in the record would permit a jury rationally to find that, if Collmorgen is guilty, he somehow was guilty only of the lesser included offense. Instead, on the record at trial, the lesser included offense isn't a valid and rational alternative to the charge against Collmorgen.

The charge for Count I required the jury to determine whether Collmorgen intentionally or knowingly caused the sexual organ of the child victim to contact or penetrate the mouth of Collmorgen. Nothing in the record suggests that Collmorgen could have been found guilty *only* of indecency with a child as it relates to Count I. There is no arguable alternative theory that the instance of Collmorgen placing the child victim's sexual organ in his mouth amounted to only "*engag[ing]* in sexual contact with the child," or "expos[ing] . . . any part of the child's genitals," with the intent to gratify Collmorgen's sexual desires. Tex Penal Code § 21.11 (indecency with child). Maxwell testified as to Count I that Collmorgen had put his teeth on his private part, and that Collmorgen touched his privates with his mouth. Dkt 12-4 at 50, 55. Therefore, when the jury found Collmorgen guilty as to Count I, aggravated sexual assault was the correct charge on which to convict. See Tex Penal Code § 22.021(a)(1)(B)(iii) (person commits offense of aggravated sexual assault if person causes sexual organ of child to contact or penetrate mouth of another person, including the actor).

Under these facts, the evidence in no way establishes that Collmorgen was guilty of only indecency with a child or that indecency with a child would have been a valid rational alternative to the charged offense. *Rousseau,* 855 SW2d at 673. As such, Collmorgen can't meet the second prong, meaning further that he wasn't entitled to an instruction for the lesser-included offense for Count I. See *Rousseau,* 855 SW2d at 672–73. Any request for such instruction by Parham would have been frivolous, and counsel isn't required to file frivolous motions or make frivolous objections. *Green v Johnson,* 160 F3d 1029, 1037

35

As to each of the foregoing assertions, Collmorgen hasn't shown that the performance by Parham was deficient or that he was actually prejudiced as a result. *Strickland*, 466 US 668. The state *habeas* court denied relief on all of Collmorgen's ineffective assistance claims. And Collmorgen fails to establish, as is his burden, that the state court's decision was contrary to clearly established federal law or was an objectively unreasonable application of it. 28 USC § 2254(d).

He thus hasn't shown that he is entitled to *habeas* relief on this claim. 28 USC § 2254(d)(1).

### 5. Prosecutorial misconduct

The standard set forth in *Darden v Wainwright*, 477 US 168 (1986), governs claims of prosecutorial misconduct in a state court prosecution. See *Parker v Matthews*, 567 US 37, 45 (2012, *per curiam*). A constitutional violation occurs only where "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 US at 181, quoting *Donnelly v DeChristoforo*, 416 US 637 (1974). Federal relief on *habeas corpus* is rarely granted on such basis because "a prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most 'egregious cases.'" *Menzies v Procunier*, 743 F2d 281, 288–89 (5th Cir 1984), quoting *Houston v Estelle*, 569 F2d 372, 382 (5th Cir 1978). A prosecutor's comments will only render a trial unfair where the improper argument was "a crucial, critical, highly significant factor in the jury's determination of guilt." *Whittington v Estelle*, 704 F2d 1418, 1422 (5th Cir 1983).

The prosecution may not knowingly use perjured testimony or allow perjured testimony to go uncorrected. *Napue v Illinois*, 360 US 264, 269 (1959). But to establish a due process violation, a petitioner must demonstrate that (i) the testimony in question was actually false, (ii) the prosecutor was aware of the perjury, and (iii) the testimony was material. *Faulder v Johnson*, 81 F3d 515, 519 (5th Cir 1996).

Collmorgen asserts that the prosecutor erred by introducing the false testimony of Kaitlyn during its rebuttal and then failing to correct it. He states that the prosecutor introduced the testimony of Kaitlyn to rebut the defense's theory. Kaitlyn testified that Collmorgen touched her vagina, touched her chest, groped her on several parts of her body both over her clothes and under her clothes, fondled her butt, had vaginal intercourse, touched her brother's genitals, and told her if she didn't perform sexual favors for him, he would pursue her brother.

Kaitlyn said the abuse took place from ages seven to nine and twelve to fourteen. Collmorgen states that he was charged with abusing Kaitlyn, which indictment, as noted above was dismissed putatively because Kaitlyn's father, Jessie Collmorgen, Sr, signed a non-prosecution affidavit. Also reiterated are his contentions about a sworn affidavit allegedly signed by Jessie Collmorgen, Sr in 2006, stating that he signed the non-prosecution affidavit because he didn't believe his children's allegations.

As noted above, neither of these were before the state *habeas* court, see generally Dkt 12-19, and so they can't be considered for disposition of Collmorgen's federal petition. And so, to the extent that Collmorgen claims that the prosecution knowingly admitted Kaitlyn's statements despite knowing of their falsity, he fails to demonstrate that the testimony in question was actually false. Dkt 1 at 11–13. Collmorgen fails to offer any factual or legal support for his claim of perjured testimony, and his bare assertions don't establish that material testimony of a false or misleading nature was admitted at trial. See *Ross v Estelle*, 694 F2d 1008, 1011 (5th Cir 1983): "Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition . . . unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."

But even if this Court considered the non-prosecution affidavit that is presented with the briefing here, it doesn't show that Collmorgen is entitled to federal *habeas* relief.

The statement of non-prosecution, signed by Kaitlyn's father, doesn't state that the allegations against Collmorgen were false or that he didn't believe them to be true. Dkt 5-1 at 20. Moreover, in the motion to dismiss signed by the attorney for the State (provided by Collmorgen), it indicates that the motion to dismiss was not based on insufficiency of evidence, but rather because the complaining witness had requested dismissal. Dkt 5-1 at 22. Neither of these documents prove that the allegations to which Kaitlyn testified to at trial were actually false. And certainly, Collmorgen hasn't shown that the prosecutor was aware of any perjury, even if it existed.

Dismissal of the prior charges related conduct against Kaitlyn in this context in no way, as argued by Collmorgen, establish that Kaitlyn's testimonial allegations against him at trial were false. And his disagreement with that testimony falls well short of any proof that she testified falsely at trial. "Conflicting or inconsistent testimony is insufficient to establish perjury." *Kutzner v Johnson*, 242 F3d 605, 609 (5th Cir 2001), citing *Koch v Puckett*, 907 F2d 524, 531 (5th Cir 1990). Rather, "contradictory trial testimony . . . merely establishes a credibility question for the jury." *Koch*, 907 F2d at 531.

Absent a showing that the testimony at issue was actually false and that the prosecutor knew it was false, Collmorgen can't establish a constitutional violation. See *Pierre v Vannoy*, 891 F3d 224, 229 (5th Cir 2018), citing *Kinsel v Cain*, 647 F3d 265, 272 (5th Cir 2011). Collmorgen claims that no state court made any findings of fact, and there is no presumption of correctness. Dkt 17. But the state court's decision will at times be unaccompanied by explanation, with no level of review having issued a reasoned opinion. The Supreme Court holds in such situations that "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 US at 98; see *Salts v Epps*, 676 F3d 468, 480 n 46 (5th Cir 2012) (applying *Harrington*).

The Texas Court of Criminal Appeals denied relief on *habeas corpus* as to the prosecutorial misconduct claim. In doing so, it reasonably applied the law to the facts, consistent with clearly established federal law.

Collmorgen hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

6.   Motion for evidentiary hearing

Collmorgen seeks an evidentiary hearing as to his challenge to his conviction and sentence. See Dkt 5. Rule 8 of the Rules Governing Section 2254 Cases states, "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." The reviewing court thus has discretion to reject the need for an evidentiary hearing. See *Conner v Quarterman*, 477 F3d 287, 293 (5th Cir 2007), citing *Roberts v Dretke*, 381 F3d 491, 497 (5th Cir 2004). Indeed, AEDPA reflects a congressional intent "to avoid unneeded evidentiary hearings" in federal proceedings on *habeas corpus* proceedings. *Williams v Taylor*, 529 US 420, 436 (2000).

Section 2254(e)(2) of Title 28 thus provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for

> constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

A federal *habeas corpus* petitioner can have an evidentiary hearing if a genuine factual dispute exists and the state hasn't afforded a full and fair hearing. *Clark v Johnson*, 202 F3d 760, 766 (5th Cir 2000), quoting *Perillo v Johnson*, 79 F3d 441, 444 (5th Cir 1996). But a petitioner isn't entitled to a federal evidentiary hearing "if his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.'" *Young v Herring*, 938 F2d 543, 560 (5th Cir 1991), quoting *Blackledge v Allison*, 431 US 63, 74 (1977); see also *Washington v Davis*, 715 F Appx 380, 385 (5th Cir 2017, *per curiam*).

Collmorgen presents nothing but conclusory assertions that he is illegally confined due to ineffective assistance of counsel at trial and prosecutorial misconduct. Dkt 1. An evidentiary hearing isn't necessary where nothing establishes a pertinent factual dispute requiring development in order to assess the claims. *Robison v Johnson*, 151 F3d 256, 268 (5th Cir 1998) (internal quotations omitted). To the contrary, all issues raised in this case can be and have been resolved based on the pleadings and submission of the trial transcript and other state-court records. Dkt 12.

The motion for evidentiary hearing will be denied. Dkt 5.

### 7. Certificate of appealability

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 USC § 2253(c)(2). This requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v*

40

*McDaniel*, 529 US 473, 484 (2000).

Reasonable jurists wouldn't find the foregoing assessment of Collmorgen's constitutional claims debatable or wrong. Collmorgen thus hasn't made the necessary showing to obtain a certificate of appealability.

A certificate of appealability will be denied.

8.  Conclusion

The pleadings and state court records show that the federal petition for a writ of *habeas corpus* brought by Petitioner Jeremy Collins Collmorgen lacks merit.

The motion by Respondent Bobby Lumpkin for summary judgment is GRANTED. Dkt 11.

Collmorgen's request for an evidentiary hearing is DENIED. Dkt 5.

Respondent's motion to direct Collmorgen to plead facts necessary to invoke jurisdiction is granted *nunc pro tunc*. Dkt 10.

Any other pending motions are DENIED AS MOOT.

The petition by Collmorgen for a writ of *habeas corpus* is DENIED. Dkt 1.

This case is DISMISSED WITH PREJUDICE.

A certificate of appealability is DENIED.

SO ORDERED.

Signed on September 30, 2023, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge